# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3650

_____

| | | |
|---|---|---|
| Jeremy Sheets, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the District |
| Michael Butera, Lieutenant, acting | * | of Nebraska. |
| in his individual capacity; | * | |
| William Jadlowski, Sergeant, acting | * | |
| in his individual capacity; | * | |
| Felands Marion, Officer, acting in his | * | |
| individual capacity; Omaha Police | * | |
| Department, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted:  June 17, 2004
Filed:  November 9, 2004

_____

Before SMITH, BEAM and COLLOTON, Circuit Judges.

_____

BEAM, Circuit Judge.

Jeremy Sheets appeals from the district court's[1] grant of summary judgment to Appellees.

_____

[1]The Honorable Joseph Bataillon, United States District Judge for the District of Nebraska.

## I.    BACKGROUND

The September 1992 murder of Kenyatta Bush remained unsolved for four years.  Although the police located her body in a ditch in Washington County, Nebraska, almost two weeks after she was reported missing, no arrests were ever made.  However, in 1996, Barb Olson told police that Adam Barnett told her son-in-law that Barnett and Sheets were involved in Bush's murder.  Omaha police personnel then obtained the statements of Olson's daughter and son-in-law, Richelle and Jason LaNoue, and Richelle agreed to wear a wire and secretly tape a conversation with Barnett.  During that taped conversation, Barnett admitted that he drove the car used in the murder of Kenyatta Bush, and implicated Sheets in the murder.[2]

Police arrested Barnett on September 27, 1996.  Once in custody, Officers Butera and Jadlowski read Barnett his <u>Miranda</u> warnings and interviewed him for about one hour regarding the events surrounding Bush's disappearance and murder.  During questioning, Barnett denied personal involvement in the murder and said that Sheets killed Bush.  Barnett then asked for an attorney and questioning ceased.

The court then appointed an attorney to represent Barnett.  The attorney arrived at the police station and spoke privately with Barnett before police formally booked Barnett for homicide.  After multiple meetings with his attorney, and with his attorney present, Barnett made another statement to the police, regarding his involvement in the murder.  In that statement, Barnett admitted to increased involvement in the murder.  He stated that Bush agreed to drive around and smoke marijuana with him and Sheets.  He further stated that he was briefly separated from the other two and that when he returned, he found Sheets holding Bush down, stabbing her.  After that statement, Barnett's attorney negotiated a plea agreement with the county attorney in

---

[2]Without more, there was sufficient probable cause at this point in the investigation to arrest Sheets.

which Barnett agreed to make a full and truthful statement to the officers, to testify truthfully at trial, to cooperate with law enforcement requests to tour the various crime scenes and to contact Jeremy Sheets in Maine. In exchange, Barnett would plead guilty to second-degree murder.

After the negotiated plea agreement, Barnett made one final, audiotaped statement to Officers Butera and Jadlowski on September 28. In that statement Barnett said that he and Sheets actually abducted Bush and that Barnett held her down as Sheets sexually assaulted her and then killed her with a knife. The information Barnett provided in this statement was not generally known to the public and was corroborated by other evidence the officers had collected.

Barnett was incarcerated in the Washington County Jail and there is some evidence that he recanted his statements while in jail. Sheets's trial record also showed, however, that while in jail, Barnett said to his uncle that "him and Jeremy were responsible for this crime." He also told his uncle that he helped Jeremy get Bush to the car, that he drug her down the lane, and that he held her down while Sheets raped her. On November 13, 1996, Barnett killed himself in his jail cell.

At Sheets's trial, the prosecution played Barnett's audiotaped confession in its entirety for the jury over Sheets's objections. Sheets presented evidence that his friendship with Barnett was strained by the time Barnett gave his confession and noted all of the inconsistencies in each of Barnett's consecutive statements to police after his arrest. Sheets also presented evidence that Barnett recanted his confession while in jail on several occasions. Officer Butera, however, testified that some of the details provided by Barnett in his confession could not have been known by the general public. For example, an uninvolved individual would not have known that Bush had been sexually assaulted, or that little blood was found on her body. The jury convicted Sheets of first-degree murder and use of a knife to commit a felony. A three-judge panel sentenced him to death. On appeal, the Nebraska Supreme Court

reversed Sheets's conviction based upon the use of Barnett's taped confession at trial. State v. Sheets, 618 N.W.2d 117 (Neb. 2000). The prosecutors did not retry Sheets for Bush's murder.

In this 42 U.S.C. § 1983 action, Sheets seeks redress for injuries he claimed resulted from constitutional violations committed by Omaha Police Department personnel. In particular, Sheets claims the officers violated the Fourth and Fourteenth Amendments by coercing or fabricating Barnett's confession and using that confession to establish probable cause for Sheets's arrest. Having determined that Appellees were entitled to qualified immunity, the district court denied as moot Sheets's appeal of the magistrate judge's order denying his motion to compel, as well as Sheets's motion for continuance to respond to the motion for summary judgment, and granted summary judgment in favor of Appellees. On appeal, Sheets argues that further discovery would allow him to establish the constitutional violations, and thus the district court erred by granting summary judgment to Appellees while the motion to compel was pending.

For the reasons set forth below, we affirm the district court.

## II. DISCUSSION

### A. Qualified Immunity

We review a grant of summary judgment de novo, applying the same standard as that applied by the district court. Jefferson v. City of Omaha Police Dep't, 335 F.3d 804, 805 (8th Cir. 2003), cert. denied, 124 S. Ct. 1409 (2004). Under Federal Rule of Civil Procedure 56(c), summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This rule "mandates

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A principal purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. Id. at 323-24.

The district court held that the individual officers were entitled to qualified immunity. "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 516 (1985)). A court required to rule upon the qualified immunity issue must consider first the threshold question of whether, construed in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. Id. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. "When applying this inquiry at the summary judgment stage, the official's conduct must be viewed through the prism of Rule 56–that is, we must take as true those facts asserted by plaintiff that are properly supported in the record." Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001). Only if a violation could be made out on a favorable view of the parties' submissions, do we take the next step and ask whether the right was clearly established. Saucier, 533 U.S. at 201. In this case, we do not get to the second step.

In his complaint, Sheets alleges violations under the Fourth, Eighth, and Fourteenth Amendments.[3] On appeal, Sheets claims that the officers violated the Constitution during their interrogation of Barnett by employing the following tactics in their pursuit of Barnett's confession: (1) improperly using threats and promises, (2)

---

[3]We do not address Sheets's claim under the Eighth Amendment, as he does not argue it on appeal.

making threats involving family and friends, (3) misrepresenting evidence, (4) playing "false friend," and (5) psychologically coercing Barnett. Sheets further argues that the officers relied upon Barnett's confession even after they should have known it was false, and, as a result, the confession did not give rise to probable cause to arrest Sheets. We disagree. The evidence presented at summary judgment did not establish a constitutional violation.

### 1.    Fourth Amendment

Under the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," the relevant inquiry is whether the officers had probable cause to arrest Sheets. U.S. CONST. amend. IV; Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000). Probable cause is to be determined upon the objective facts available to the officers at the time of the arrest, and exists if "'the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense' at the time of the arrest." Id. (alteration in original) (quoting Hannah v. City of Overland, Mo., 795 F.2d 1385, 1389 (8th Cir. 1986)).

We agree with the district court that Sheets did not present sufficient evidence of any Fourth Amendment violation. At the time of Sheets's arrest, the police had uncontroverted, unrebutted statements by Barnett, a claimed accomplice, made in the presence of his attorney after hours of consultation with that attorney, and made after a plea agreement with the county attorney, that *clearly* indicated Sheets killed Bush. Appellees also gave considerable weight to Barnett's statement because he furnished details of the murder that only someone involved in the murder would know: the physical evidence was consistent with a sexual assault (a fact not released to the public), Bush's injuries were consistent with Barnett's account of the murder, and physical evidence supported Barnett's account that Bush had been killed while on her

-6-

back and had been transported in the trunk of a car in the same position. Given the objective facts available to the police at the time of Sheets's arrest, they had probable cause to conclude that Sheets had committed, or was somehow involved in, Bush's murder.

The fact that Barnett's statements to the police changed somewhat over time, becoming more and more inculpatory each time, does not negate the existence of probable cause here. We agree with the district court that "[i]t seems plausible, or even likely, that, for multiple reasons a suspect would come to a gradual awareness of the need to assume responsibility for a crime." The evidentiary value or admissibility of the statements is not at issue. Based upon the facts known to the officers at the time of Sheets's arrest, construed in the light most favorable to Sheets, there is no evidence that supports a Fourth Amendment violation.

### 2. Fourteenth Amendment

"The Fourteenth Amendment guarantees '[s]ubstantive due process [, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" Moran v. Clarke, 296 F.3d 638, 643 (8th Cir. 2002) (alterations in original) (quoting Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)). Like the district court, we construe Sheets's claims challenging the officers' behavior during Barnett's interrogation as a substantive due process claim. According to Sheets, the officers coerced Barnett's confession and the officers knew Barnett's confession was false.

> In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance the liberty of the individual and the demands of an organized society. . . . At the outset, we identify the individual liberty interests at stake and the established demands of an organized society at issue. We then analyze, qualitatively, whether the interests asserted are sufficiently important for

-7-

substantive due process consideration. Ultimately, within this context, we assess whether the government's contested actions are conscience shocking.

Id. at 643-44 (internal quotations and citations omitted).

The contested actions in this case are the interrogation tactics employed by the officers. Sheets claims that the officers coerced Barnett using methods to "railroad one innocent man into a false confession that implicated another innocent man." We disagree.

It is unnecessary for us to conduct an inquiry into the alleged liberty interest at stake or the particular demand of an organized society at issue because the behavior alleged in this case does not rise to the level of conscience-shocking behavior that may sustain a substantive due process claim. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). "[T]he threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. at 848 n.8. The alleged "coercion" in this case, if there was any at all, certainly does not rise to this level of egregiousness.

In reviewing police tactics to obtain a confession under the Due Process Clause, we focus on the crucial element of police overreaching. Colorado v. Connelly, 479 U.S. 157, 163 (1986). However, even though the police use overreaching tactics such as the use of threats or violence, or the use of direct or indirect promises, such promises or threats will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self determination. Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002), cert. denied, 124 S. Ct. 233 (2003). Ours is a totality-of-the-circumstances inquiry. We consider,

-8-

among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.  Id.

Here, not only does the specific conduct contested by Sheets fail to rise to the conscience-shocking level, there is no evidence that the conduct of the officers overcame Barnett's free will and impaired his capacity for self determination.  See id.  Contrary to Sheets's argument, telling Barnett that people had come to the police with information that he and Sheets were involved in the murder, and that Sheets would be interviewed at some time, does not amount to a threat that could lead to a false confession.  Nor does pointing out to Barnett that he was a twenty-one-year-old man with a young family and that the way he handled the current situation would affect how his family viewed him in the future, nor that the police already had enough evidence to know of Barnett's involvement but that he just needed to better explain how and why the murder happened.  These tactics simply do not amount to unconstitutional coercion.  It goes without saying that the interrogation of a suspect will involve some pressure.  The very purpose is to elicit a confession.  United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002).

Barnett's audiotaped confession took place after he was Mirandized and in the presence of his attorney, with whom Barnett had spent considerable time; the length of each of the interviews was not especially long; the police ceased the initial interview immediately upon Barnett's request for an attorney; and Barnett was given time between interviews to consider the situation free of police pressure.  Further, the weight Sheets attempts to place on the discrepancies in each of Barnett's accounts is too great.  The fact that Barnett increased his own culpability in Bush's murder as he confessed to the police does not suggest that he was "fed" information by the interrogating officers.  And it certainly does not suggest that the officers were feeding information to Barnett that implicated Sheets.

-9-

In light of these circumstances, and viewing the evidence in the light most favorable to Sheets, we find that tactics such as those contested by Sheets were not so coercive as to deprive Barnett of his ability to make an unconstrained decision to implicate Sheets and to confess to his own involvement in the murder, and do not rise to the level of malice or sadism resulting in the inhumane abuse of power that literally shocks the conscience. See Moran, 296 F.3d at 647.

Finally, in his complaint, Sheets alleges that the officers obtained a search warrant based upon Barnett's audiotaped statement, which they knew to be false. Sheets's argument on appeal concerning the clearly established state of the law is irrelevant at this stage of the analysis. As previously noted, before we determine whether the law was clearly established for purposes of qualified immunity, we first must determine whether the facts alleged show that the officers violated a constitutional right. We have determined that the tactics employed by the officers in obtaining Barnett's statement do not offend the Constitution. And Sheets presented no evidence that the officers either knew or recklessly disregarded a risk that Barnett was lying. Thus, statements made in a warrant relating information from Barnett's confession are not false nor made with reckless disregard for the truth.

## C.    Motion to Compel

The more critical issue on appeal, according to Sheets, is the district court's failure to rule on the merits of the pending motion to compel before granting summary judgment in favor of the defendants. "Our review of questions concerning discovery matters is very deferential. . . . We will not reverse such a determination absent a gross abuse of discretion resulting in fundamental unfairness in the trial of the case." SDI Operating P'ship, L.P. v. Neuwirth, 973 F.2d 652, 655 (8th Cir. 1992) (quotations omitted).

-10-

At the time the district court ruled on the summary judgment motion, Sheets's discovery motion was pending. In that motion, Sheets sought the testimony of Barnett's court-appointed attorney concerning the attorney's conversations with Barnett when Barnett was interrogated and when he confessed. Sheets claims that the attorney's testimony would call into question the constitutionality of the officers' behavior in obtaining Barnett's confession and the voluntariness of the same. The district court ruled that the motion was moot because the defendants were entitled to qualified immunity. On appeal, Sheets spends significant time arguing the merits of his claim that the motion to compel should have been granted because the personal representative of Barnett's estate waived the attorney-client privilege. We need not get that far.

The defendant's motion for summary judgment raised two overlapping claims: (1) the individual officers were entitled to qualified immunity, and (2) Sheets could not substantiate the merits of his claim. Thereafter, Sheets filed a motion to continue the response deadline to conduct discovery on all issues presented by the officers' motion *except* for the issue of qualified immunity, stated to the court that he was "able to address the issues relating to qualified immunity now," and submitted a responsive brief on that issue. Sheets then later filed the motion to compel without retracting his prior affirmation to the court that the issue of qualified immunity was ripe for determination.

At Sheets's very request, then, the district court ruled on the pending summary judgment motion with respect to qualified immunity. That ruling, of course, required the district court to evaluate the merits of the constitutional violation in light of the evidence available. Saucier, 533 U.S. at 200. At best for him, Sheets's motions were in conflict. We cannot fault the district court for traveling a course that Sheets ambiguously, or perhaps unwittingly, marked.

-11-

Given the status of the case at the time the district court ruled on the qualified immunity issue, we see no basis for Sheets's arguments concerning the district court's denial of the motion to compel.  The district court did not abuse its discretion.[4]

## III.  CONCLUSION

For the reasons stated herein, we affirm the order of the district court.

_____

---

[4]Sheets's apparent request for a qualified immunity ruling notwithstanding, we see no reason to consider the attorney-client privilege question.  Even assuming that Barnett may have been able to assert a substantive due process claim, we have found no precedent that the benefits of such a claim could run vicariously to Sheets under the circumstances of this case.  And, Sheets cites none.